## Louisville & Nashville Railroad Co. v. Ohio Valley Tie Company

(Decided June 5, 1912.)

Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

1. Railroads—Intra-state Shipments.—Where one sells and contracts to deliver to two railroads, ties f. o. b. cars Louisville, and contracts with a carrier to transport the ties from points within the same state to the point of destination, the shipments are intra-state shipments, notwithstanding the fact that the purchasing railroads intended when the ties were shipped, to send them, and actually did send them, to points outside of the state as company material, and under an arrangement to which neither the shipper nor the carrier transporting the ties was a party.

2. Payment—Mistake—Recovery.—Where a shipper sells ties under a contract with the purchaser to pay the freight thereon and deduct the amount from the purchase price, and the ties are intra-state shipments, and the purchasers by mistake pay the inter-state rate on the shipments instead of the intra-state rate, which is lower than the inter-state rate, the shipper may recover the difference from the transporting carrier.

HELM BRUCE and BRUCE & BULLITT for appellant.

HINES & NORMAN and BODLEY & BASKIN for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Appellee, Ohio Valley Tie Company, brought this action against appellant, Louisville & Nashville Railroad Company, to recover the difference between the intra-state rate and the inter-state rate on certain railroad ties which it had shipped over the railroad from certain points in Kentucky to Louisville, Kentucky. The amount involved is $8,189.91. From a judgment in favor

of appellee, the railroad company appeals. It is admitted that the inter-state rate is higher than the intra-state rate. It is not contended that the inter-state rate, as charged, is higher than the established rate, but that as the shipments were intra-state, the inter-state rate should not have been charged. The simple question, then, is, were the shipments inter-state or intra-state?

Appellee is engaged in the business of buying and selling railroad ties. Prior to the shipment of the ties involved in this ' litigation, it had entered into written contracts with the Pennsylvania Railroad Company, and with the Cleveland, Cincinnati, Chicago & St. Louis Railway Company (known as the "Big Four"), whereby it sold to them about 500,000 ties at a fixed price, f. o. b. cars at Louisville, Kentucky. The cars were billed from the Ohio Valley Tie Company to the Ohio Valley Tie Company, care Pennsylvania Company, or to the Pennsylvania Company direct, or to the "Big Four" direct. There also appeared on the bills of lading either "care R. A. Bury" or "care W. H. Scriven, Sup't." Under the contracts with the railroad companies, they were to pay the freight on the ties to Louisville, and in settling with appellee, the consignor, they were to deduct the amount of the freight from the purchase price of the ties. Upon arrival of the cars at Louisville, they were delivered to the consignees. Appellant demanded the inter-state rate on the shipments, and the consignee paid the freight according to that rate.

Appellee's president testifies that his company had no intention one way or the other regarding the movement of the cars beyond Louisville. Its contracts with both of the railroad companies required that the ties be delivered f. o. b. cars Louisville, and it had nothing whatever to do with the movement of the cars after their delivery. His company had no understanding with the purchasers with reference to the disposition of the ties or cars after they reached Louisville. Upon reaching Louisville, the ties became the property of the purchasers, and from that time were entirely under their control, and subject to any disposition they desired to make of them. This witness further testifies that appellee had a representative at the various places of shipment, but that the instructions regarding the billing were given by the inspector of the Pennslyvania Railroad.

The evidence for appellant is to the effect that there

were 89 carloads of ties involved. 18 of them were for the Big Four, and 71 for the Pennsylvania. Prior to the shipment of these cars, some of the ties shipped had been used by the purchasing railroads in Louisville. Appellant afterwards ascertained that some of the previous shipments had, as a matter of fact, been sent out of the state. Upon seeing that some of the cars containing the shipments in question were billed care of R. A. Bury, and others care of W. H. Scriven, Sup't., and learning that they were officers of the purchasing carriers and lived outside of the state of Kentucky, they ascertained by further inquiry that the ties were destined to points in another state, and that, as a matter of fact, all the ties in question, without being unloaded, went forward in the same cars to points outside of the state of Kentucky. For this reason, the rate clerk concluded that the inter-state rate should be charged on the shipments, and it was charged.

The evidence further shows that the ties, when received at Louisville by the purchasing carriers, were shipped by them as "company material" or "deadhead" to various points on their lines outside of the state of Kentucky.

For appellant it is insisted that because the purchasing carriers had the right to give shipping directions, and the way bills or contracts of shipment showed that the ties were shipped to the purchasing carriers in care of parties who, as a matter of fact, did not live in Louisville, and inquiry developed the fact that the ties, without being unloaded, went through in the same cars to points outside of the State, the shipments, notwithstanding the contracts of shipment, were actually destined to points outside of the state, and having actually started in the course of transportation to another state, were necessarily inter-state commerce. In other words, it is insisted that the contracts of shipment do not control, in view of the fact that the ties were destined to, and actually went to, points outside of the state.

The rule announced in Gulf C. & S. F. R. Co. v. State of Texas, 204 U. S., 403, is, we think, controlling in this case. There, Saylor and Burnett, of Goldthwaite, Texas, purchased of the Samuel Hardin Grain Co., of Kansas City, Mo., two cars of corn, at a delivered price, f. o. b. cars, Goldthwaite, Texas. The Samuel Hardin Grain Co., did not at that time have the grain, and purchased it of the Harroun Commission Co., at a delivered price

f. o. b. cars, Texarkana, Texas.   The Harroun Commission Co., had previously purchased two cars of grain for delivery, f. o. b. cars, Texarkana, Texas. and these cars were used by it to fill the order from the Samuel Hardin Grain Co.   When the cars arrived at Texarkana, an agent of the Samuel Hardin Grain Co., ordered the cars delivered to the Texas Pacific Railroad Co., and then rebilled them from Texarkana to Goldthwaite. When the cars arrived at Goldthwaite, Saylor and Burnett, acting for the Samuel Hardin Grain Co., tendered and delivered to the carrier, the Gulf C. & S. F. R. Co., the amount of the freight according to the local rate.   The delivering carrier refused to accept the amount tendered, but demanded and collected the freight according to the inter-state rate.   Later the State of Texas sued the delivering carrier to recover the penalty provided by the statute of that state for having charged and collected a rate in excess of the rate fixed by the State Railroad Commission.   There was a recovery in the trial court, and an affirmance of the judgment, both by the Texas Court of Civil Appeals and the Supreme Court of Texas, and, on a writ of error to review the judgment of the Supreme Court of Texas, the judgment was affirmed by the Supreme Court of the United States.   In view of the thorough discussion of the question involved, we quote at length from the opinion of that court.

"It is undoubtedly true that the character of a shipment, whether local or inter-state, is not changed by a transfer of title during the transportation.   But whether it be one or the other may depend on the contract of shipment.   The rights and obligations of carriers and shippers are reciprocal.   The first contract of shipment in this case was from Hudson to Texarkana.   During that transportation a contract was made at Kansas City for the sale of the corn, but that did not affect the character of the shipment from Hudson to Texarkana.   It was an inter-state shipment after the contract of sale as well as before.   In other words, the transportation which was contracted for and which was not changed by any act of the parties, was transportation of the corn from Hudson to Texarkana—that is, an inter-state shipment.   The control over the goods in process of transportation, which may be repeatedly changed by sales, is one thing; the transportation is another thing, and follows the contract of shipment, until that is changed by the agreement of owner and carrier.   Neither the Harroun nor

the Hardin Company changed or offered to change the
contract of shipment or the place of delivery. The Hardin Company accepted the contract of shipment theretofore made, and purchased the corn to be delivered at
Texarkana—that is, on the completion of the existing
contract. When the Hardin Company accepted the corn
at Texarkana the transportation contracted for ended.
The carrier was under no obligations to carry it further.
It transferred the corn, in obedience to the demands of
the owner, to the Texas & Pacific Railway Company, to
be delivered by it, under its contract with such owner.
Whatever obligation may rest upon the carrier at the
terminus of its transportation to deliver to some further carrier in obedience to the instructions of the owner,
it is acting not as a carrier but simply as a forwarder.
No new arrangement having been made for transportation, the corn was delivered to the Hardin Company at
Texarkana. Whatever may have been the thought or
purpose of the Hardin Company in respect to the further disposition of the corn was a matter immeterial
so far as the completed transportation was concerned.

"In this respect there is no difference between an
inter-state passenger and an inter-state transportation.
If Hardin, for instance, had purchased at Hudson a ticket
for inter-state carriage to Texarkana to go on to Goldthwaite, he would not be entitled, on his arrival at Texarkana, to a new ticket from Texarkana to Goldthwaite
at the proportionate fraction of the rate prescribed by
the Inter-state Commerce Commission for carriage from
Hudson to Goldthwaite. The one contract of the railroad companies having been finished he must make a new
contract for his carriage to Goldthwaite, and that would
be subject to the law of the State within which that carriage was to be made.

"The question may be looked at from another point
of view. Supposing a carload of goods was shipped from
Goldthwaite to Texarkana under a bill of lading calling
for only that transportation, and supposing that
the laws of Texas required, subject to penalty,
that such goods should be carried in a particular kind of car—can there be any doubt that the
carrier would be subject to the penalty, although
it should appear that the shippper intended, after
the goods had reached Texarkana, to forward them
to some other place outside the State? To state the question in other words—if the only contract of shipment was

for local transportation, would the State law in respect to the mode of transportation, be set aside by a Federal law in respect to inter-state transportation, on the ground that the shipper intended, after the one contract of shipment had been completed, to forward the goods to some place outside the State? Coe v. Errol, 116 U. S. 517-527, 29 L. Ed. 715-718, 6 Sup. Ct. Rep. 475.

"Again, it appeared that this corn remained five days in Texarkana. The Hardin Company was under no obligation to ship it further. It could, in any other way it saw fit, have provided corn for delivery to Saylor & Burnett, and unloaded and used that car of corn in Texarkana. It must be remembered that the corn was not paid for by the Hardin Company until its receipt in Texarkana. It was paid for on receipt and delivery to the Hardin Company. Then, and not till then, did the Hardin Company have full title to and control of the corn, and that was after the first contract of transportation had been completed.

"It must further be remembered that no bill of lading was issued from Texarkana to Goldthwaite until after the arrival of the corn at Texarkana, the completion of the first contract for transportation, the acceptance and payment by the Hardin Company. In many cases it would work the grossest injustice to a carrier if it could not rely on the contract of shipment it has made, know whether it was bound to obey the State or Federal law, or, obeying the former, find itself mulcted in penalties for not obeying the law of the other jurisdiction, simply because the shipper intended a transportation beyond that specified in the contract. It must be remembered that there is no presumption that transportation when commenced is to be continued beyond the State limits, and the carrier ought to be able to depend upon the contract which it has made, and must conform to the liability imposed by that contract."

Applying the rule above announced to the facts of this case, we find that appellee, the Ohio Valley Tie Company, had contracted to deliver the ties in question to the purchasing carriers f. o. b. cars at Louisville. Having obligated itself to deliver the ties at that point, it had a right to contract for their shipment to that point, and did in fact make such contracts with appellant. Pursuant to these contracts of shipment, appellant received the ties and actually delivered them to the purchasing carriers. Though the tie inspector of the pur-

chasing carriers had the right to give billing directions, it was not within his power to bind appellee by any directions that he might give looking to a movement of the cars beyond Louisville, the point at which appellee had agreed to deliver the ties. The memoranda on the bills of lading to the effect that certain cars were in care of one person and certain other cars were in care of another person were for the mere convenience of the purchasing carriers, for when the ties were delivered at Louisville, as per contract, appellee's contract was then performed, and the title to the ties then passed to the purchasing carriers. From that time on, the movement of the cars containing the ties was a matter of no concern to appellee. When the cars were started, its only intention was to contract for their delivery at Louisville. As to what disposition would then be made of them it had no intention. Certainly the mere intention of the purchasing carriers, an intention which we find as a matter of fact was not shared in by either appellant or appellee, could not in anywise affect the contracts for transportation which appellee had made with appellant. Notwithstanding the billing directions, showing that the cars were in care of certain persons who, as a matter of fact lived outside of the State, appellant, under the contracts of shipment, was not required to transport the ties outside of the State. It simply delivered the ties to the purchasing carriers, they accepted the ties, and such deliveries were regarded by the parties as sufficient for all purposes. In delivering the ties at the termination of the transportation contracted for appellant acted not as a carrier, but as forwarder. So far as it was concerned, the transportation contracts were completed. The subsequent transportation of the ties to points outside the State was an entirely new transaction, with which neither appellant nor appellee was concerned. Having received the ties, the purchasing carriers had a right to do with them as they pleased. Neither their action in this respect, nor their purpose, when the ties were originally started for Louisville, to take such action, could change the character of the shipments as fixed by the original contracts between appellee and appellant, and impose upon appellee the burden of paying the inter-state rate for what were in fact intra-state shipments. Manifestly, if the case were reversed, and the inter-state rate had been less than the intra-state rate, it would hardly be contended that appellee, notwith-

standing the fact that its contracts of shipment with appellant fixed Louisville as the destination of the ties, and the ties were actually delivered to and accepted by the purchasing carriers at that point, was, as a matter of fact, entitled to the inter-state rate, merely because appellant, by making inquries, could have ascertained that the purchasing carriers all the while intended to send the ties to points outside of the State, and did so send them, under an arrangement as to transportation to which neither appellant nor appellee was a party. We do not mean to hold that there may not be cases where the contract of shipment is not conclusive. Cases may arise where there may be fraud and collusion on the part of the shipper and the carrier, or an attempt on their part to evade the provisions of some Federal or State law. In such cases, and in many others, no doubt, the courts may look further than the mere contracts of shipment, and determine the true character of the shipments from the actual facts and circumstances. No such case, however, is presented by this record. Appellee had the right to contract for the transportation of the ties to the point where it had agreed with the purchasers to deliver them. This is all that it did. As the contracts of shipment provided for transportation from points within the state to Louisville, another point within the state, it was entitled, under its contract, to the intra-state rate, a right which no purpose or subsequent conduct on the part of the purchasing carriers could in any way affect.

We see nothing in the case of Southern Pacific Terminal Co. v. Inter-state Commerce Commission, 219 U. S., 498, that conflicts with the rule herein announced.

As, under the contracts of purchase, the freight on the ties was to be paid by the purchasing carriers and credited on the purchase price, the purchasing carriers simply acted as appellee's agents in paying the freight, and the payments were in no sense made on their behalf. The effect is the same as if appellee itself had made the payments. The payments having been made under the mistaken belief that the inter-state rate applied, when as a matter of fact the shipments were intra-state, and, therefore, subject to the rates fixed for local transportation, there can be no doubt of appellee's right to recover.

Judgment affirmed.