[Civil No. 1529.  Filed May 19, 1917.]

[165 Pac. 303.]

# SOUTHERN PACIFIC COMPANY, Appellant, v. STATE, Appellee.

1. CARRIERS—CONTROL—PROCEEDINGS BEFORE CORPORATION COMMISSION—REVIEW.—That a formal complaint was not filed before the Corporation Commission, nor the witnesses sworn, will not be considered on appeal from a decision of the superior court allowing recovery of a fine assessed by the commission where the irregularity was not urged before the commission on motion for rehearing, in view of Civil Code of 1913, paragraph 2342, providing that no corporation or person or the state shall in any court urge or rely on any ground not set forth in the application for rehearing, and paragraph 2329, providing that informality in proceedings or taking testimony shall not invalidate any order, decision, or rule approved by the commission.

2. COMMERCE—"INTRASTATE COMMERCE"—TRANSPORTATION OF CIRCUS BETWEEN POINTS WITHIN THE STATE.—In a proceeding before the Arizona Corporation Commission to compel defendant railroad to transport the Campbell's United Shows from Tucson to Phoenix, *held*, that movement between named points was intrastate subject to jurisdiction of the commission, although shows were engaged in a journey beginning in Texas and ending in California; the movement of the circus being a mere incident to the object of its existence.

3. CARRIERS—TRANSPORTATION OF PRIVATELY OWNED EQUIPMENT OF CIRCUS—COMMON-LAW DUTY.—The Southern Pacific Company was under no common-law obligation to accept and transport privately owned equipment of Campbell's United Shows from Tucson to Phoenix.

4. CARRIERS—CONTROL—POWERS OF CORPORATION COMMISSION.—Under Constitution, article 15, sections 2, 3, and Civil Code of 1913, chapter 11, title 9, it is obligatory upon common carriers to accept and transport between points within the state privately owned equipment of circuses under the rules, regulations, and rates, when reasonable and just, prescribed by the Corporation Commission, although carrier has not filed with the commission rates therefor.

[As to circus proprietor as a person engaged in trade, see note in Ann. Cas. 1916A, 1199.]

5. APPEAL AND ERROR—CONSTITUTIONALITY OF STATUTE—PARTIES WHO MAY QUESTION.—Where the order of Corporation Commission could be violated but once, and daily accumulation of penalties or fines

could not arise, appellant was not affected by that feature of Civil
Code of 1913, paragraph 2357, making each day's continuance of a
continuing violation a separate and distinct offense, and could not
urge for the first time on appeal that such statute is unconstitu-
tional.

APPEAL from a judgment of the Superior Court of the
county of Maricopa.   R. C. Stanford, Judge.   Affirmed.

Mr. C. W. Durbrow, Mr. F. B. Austin and Mr J. C.
Forest, for Appellant.

Mr. Wiley E. Jones, Attorney General, and Mr. R. Wm.
Kramer and Mr. G. W. Harben, Assistant Attorneys General,
for the State.

ROSS, J.—This is an action to recover a fine assessed
against appellant by the Corporation Commission for con-
tempt in refusing to obey an order of the Corporation Com-
mission directing it to transport Campbell's United Shows
from Tucson to Phoenix, Arizona.   Authority for the action
is found in paragraph 2356, chapter 11, title 9, Civil Code of
1913.

In the complaint were set forth all the proceedings before
the commission, including its findings of fact, conclusions of
law, orders and judgments, both in the original hearing and
the hearing in contempt.   The answer of the appellant con-
sists of: (1) Demurrers, general and special, the special being
that the court had no jurisdiction of either the person or sub-
ject matter; (2) averments that the order made and entered
was not supported or sustained by any competent evidence
or by any evidence whatsoever, or that any lawful proceed-
ing was held by said commission in the matter of fixing rates;
(3) that the Corporation Commission was without jurisdic-
tion to fix rates for transporting Campbell's United Shows
from Tucson to Phoenix for the reason, among others, that
the movement of said shows between the named points was
interstate in character, the said shows being engaged in a
journey beginning at El Paso, Texas, and extending through
the states of New Mexico and Arizona into California, the
destination of said Campbell's United Shows having been
fixed at the city of San Bernardino, California, at the time
said shows began their journey at said city of El Paso; and

(4) that the commission had no jurisdiction to make or enter said order for the further reason that there were no intrastate tariffs then on file with said commission showing the rate for the movement of privately owned equipment in circus trains or otherwise or obliging defendant to transport privately owned equipment in circus trains.

The court's findings of fact and conclusions of law are as follows:

"II.    That on the 20th day of March, 1914, there was promulgated under the authority and seal of the Arizona Corporation Commission in docket No. 165 of that commission an order to show cause, on or before the 23d day of March, 1914, why the Arizona Corporation Commission should not issue a special rate authority compelling the defendant to publish on one day's notice a rate for the transportation of Campbell's United Shows, consisting of 18 cars, from Tucson, Ariz., to Maricopa, Ariz., at the rate of $3 per mile, and further requiring the defendant to furnish such equipment as was necessary to move Campbell's United Shows within the state of Arizona.

"III.    That pursuant to said order to show cause, the defendant appeared before the Arizona Corporation Commission on the 25th day of March, 1914, and after a full and fair hearing the Arizona Corporation Commission entered the following order: 'That the Southern Pacific Company and Arizona Eastern Railroad Company transport the cars, property, employees and attendants of Campbell's United Shows from Tucson, Ariz., via Maricopa, to Phoenix, Ariz., and to extend to the said Campbell's United Shows the usual privileges in the movement of advance agents, for a total amount not to exceed $3 per train mile for the entire service. It s understood that the shipment will consist of not to exceed four coaches, four large box cars and ten flat cars, and it is further understood that the Southern Pacific Company and Arizona Eastern Railroad Company may enter into a contract covering this transportation, the terms of which shall not be in substantial variance with the contract now existing between the Arizona Eastern Railroad Company and Sells-Floto Shows Company, with respect to details as to responsibility, service and conditions, copy of said contract being on file with the commission, and made on March 4, 1914, by and between the Arizona Eastern Railroad Company and

Sells-Floto Shows Company. It is further ordered that, upon submission of evidence that any charge or charges have been exacted by respondent companies for transportation of advance agents or employees, at variance with contract herein referred to, made by respondent Arizona Eastern Railroad Company with Sells-Floto Company, that the amount or amounts so collected shall be refunded to Campbell's United Shows.'

"IV. That on the 28th day of March, 1914, the Arizona Corporation Commission denied the defendant's application for a rehearing of said order recited in paragraph III hereof.

"V. That said order entered by the Arizona Corporation Commission on the 25th day of March, 1914, as recited in paragraph III hereof, was not complied with by defendant, but wholly ignored.

"VI. That on the 31st day of March, 1914, the state of Arizona, at the relation of George P. Bullard, Attorney General, filed a petition addressed to the Arizona Corporation Commission, praying that an order be entered, directed to the defendant, requiring it to show cause why it should not be punished for contempt of the order of the Arizona Corporation Commission, as recited in paragraph III hereof, and that pursuant to the said petition, the Arizona Corporation Commission, on the 1st day of April, 1914, entered an order, directed to the defendant, requiring it to show cause on the 13th day of April, 1914, at 10 o'clock a. m., why it should not be punished for contempt, as alleged in the said petition of the state of Arizona, at the relation of George P. Bullard, its Attorney General, as aforesaid.

"VII. That pursuant to said petition of the state of Arizona, at the relation of George P. Bullard, Attorney General, a hearing was had, and the defendant was adjudged guilty of a contempt of the order of the Arizona Corporation Commission, recited in paragraph III hereof, whereupon the Arizona Corporation Commission, upon the 16th day of May, 1914, entered the following order: 'It is therefore ordered that the Southern Pacific Company be and it is hereby declared in contempt of this commission's order, in docket No. 165, and the said company be and it is hereby fined the sum of $1,500. It is further ordered that Arizona Eastern Railroad Company be and it is hereby declared in contempt of this commission's order, in docket No. 165, and that the said com-

pany be and it is hereby fined the sum of $500. It is further ordered that copies of this order be served upon Southern Pacific Company and Arizona Eastern Railroad Company, and the Attorney General of the state of Arizona, and unless the fines, as herein imposed, be paid and satisfied on or before June 1, 1914, that the Attorney General shall proceed to the collection of same as provided by law.'

"VIII. That the defendant refused to pay and satisfy the fine imposed by said order of the commission, as recited in paragraph VII herein, on or before June 1, 1914, and thereupon, to wit: Upon the 20th day of June, 1914, the state of Arizona filed with the above-entitled court its complaint against the defendant, which prayed for the recovery of the sum of $1,500, the fine assessed against the defendant by the Arizona Corporation Commission for a contempt of the order of said Arizona Corporation Commission, as recited in paragraph III hereof.

"IX. That the defendant engaged itself to transport for hire circuses and other institutions similar to that conducted by Campbell's United Shows, which the defendant was required to transport, as provided by the order recited in paragraph III hereof.

"Conclusions of Law.

"The court from the above special findings of fact concludes as a matter of law therefrom as follows:

"I. That the Arizona Corporation Commission had jurisdiction of the person of the defendant and the subject-matter of the action, and was authorized and empowered by the Constitution and laws of the state of Arizona to enter the order as recited in paragraph III of the special findings of fact, and to adjudge the defendant in contempt for a refusal to obey said order.

"II. That the above-entitled court has jurisdiction of the person of the defendant, and the subject-matter of the above-entitled cause of action, and is empowered by the Constitution and laws of the state of Arizona to enforce and collect the fine imposed upon the defendant by the Arizona Corporation Commission for a violation of the order of that commission, as recited in paragraph III of the special findings of fact herein.

"III. That the order of said Arizona Corporation Commission, as recited in paragraph III of the special findings of

fact, in no way imposed a burden upon interstate commerce, in contravention of section 8 of article 1 of the Constitution of the United States.

"IV.   That it was the duty of the defendant, under the Constitution and laws of the state of Arizona, to transport Campbell's United Shows, as provided by the order of the Arizona Corporation Commission, as recited in paragraph III of the special findings of fact, even though it acted in such capacity as a private carrier, for the reason that it had held itself out and engaged to transport circuses and other institutions similar to Campbell's United Shows.

"V.   That even though the defendant, in the transportation of Campbell's United Shows, engaged itself as a private carrier, it so engaged itself as a carrier for hire, and was, under the Constitution and laws of the state of Arizona, subject to regulation by the Arizona Corporation Commission.

"VI.   That the order of the Arizona Corporation Commission as recited in paragraph III of the special findings of fact did not impair the liability of the defendant as a private carrier.

"VII.   That the plaintiff is entitled to judgment against the defendant for the sum of $1,500."

The questions raised on this appeal by the appellant in its assignments of error are whether the original proceeding by the Corporation Commission fixing the rate to be charged Campbell's United Shows for transportation from Tucson to Phoenix was null and void for the reason: (1) That there was no formal complaint filed against the appellant with the Corporation Commission either on its own motion or on the motion of any third party; that at the hearing the witnesses who made statements to the commission in the nature of evidence were not sworn; and (2) if these statutory requirements and formalities were waived by the appellant, whether the movement of Campbell's United Shows was an interstate transaction, and therefore not within the jurisdiction of the State Corporation Commission; also (3) whether the Corporation Commission had jurisdiction to make its order requiring the appellant to enter into a special contract as a private carrier for the transportation of the privately owned equipment of Campbell's United Shows; and (4) whether the statute authorizing the assessment of a fine for disobedience of its order is constitutional.

We do not think that the appellant is in a position to complain of the informal and irregular manner in which the proceeding was instituted before the commission, nor because the witnesses were not sworn. A formal complaint setting forth a grievance against the appellant should have been filed and, of course, the testimony should have had the sanctity of an oath. These things seem to be required by the statute and by the rules of the Corporation Commission—paragraph 2336, Civil Code of 1913, and rule 5 of Practice and Procedure, A. C. C. The omission to follow the statute and the rules of the commission, when concurred in by the appellant, as was done in this case, no prejudice being apparent, ought not now to be permitted to upset the whole proceeding. Although this question could have been presented to the Corporation Commission by appellant on its motion for a rehearing, it was not done. Paragraph 2342, Id., among other things, provides:

"No cause of action arising out of any order or decision of the commission shall accrue in any court to any corporation or person, or the state, unless such corporation or person, or the state, shall have made, before the effective date of said order or decision, application to the commission for a rehearing. Such application shall set forth specifically the ground or grounds on which the applicant considers said decision or order to be unlawful. No corporation or person, or the state, shall in any court urge or rely on any ground not set forth in said application."

Again it is provided (paragraph 2329, Id.) that the commission shall not be bound by the technical rules of evidence, and that informality in proceedings or in taking testimony shall not invalidate any order, decision or rule approved by the commission.

Of course if the movement of Campbell's United Shows from Tucson to Phoenix was an interstate movement, the order of the commission was void for want of jurisdiction over the subject matter. The evidence shows that this show was traveling around over the country giving exhibitions; that early in February, 1914, it was at El Paso, Texas; that at that time its agent inquired of the appellant for rates from that place through New Mexico into Arizona with a probable destination into California. No arrangement was effected between the appellant and Campbell's United Shows for

transportation over appellant's line of railway. The shows, in fact, under a special contract with the El Paso & Southwestern Railroad Company, were transported from El Paso to Tucson with stop-overs at Douglas and Bisbee. When the show people made application to the appellant at Tucson for a contract to transport their equipment and entourage from Tucson to Phoenix appellant stated to them that it could not make a contract as a common carrier; that it had already entered into a contract with Sells-Floto Shows to transport them from Tucson to Phoenix; and that under the rules it could not transport Campbell's United Shows for a space of thirty days after the Sells-Floto Shows had been transported.

In the hearing before the Corporation Commission in the matter of fixing a rate the attorney for the appellant gave two reasons for not entering into a contract with Campbell's United Shows: First, he said:

"We wish to take the position we are not common carriers for circuses and carnivals; we want that in the record."

And, second:

"I am not acquainted with this special thirty-day contract, but I understand there is an agreement between all show people as well as railroads to keep the shows spaced. This show coming in before Sells-Floto and with which the company has a contract, if he tenders the money—the freight at the regular rate, we have to carry him."

These were the only reasons suggested by the appellant at the hearing before the commission for not entering into a contract to transport Campbell's United Shows from Tucson to Phoenix. There was no suggestion or intimation at that time that the movement was an interstate movement, although the evidence discloses that the agent for Campbell's United Shows stated that the show would go from Phoenix to Prescott, Clarkdale, and Kingman, and from Kingman to Needles, California.

It developed that appellant and other railroads of this section of the country had been accustomed to enter into contracts of transportation with circuses and carnival shows at rates very much less than the regular tariffs and containing terms of exemption from the liability of common carriers; that Campbell's United Shows had such a contract in 1913 with appellant and other roads in this and contiguous states. It was in this action that appellant raised the question of the

interstate character of the movement from Tucson to Phoenix, claiming it as an integral part of a continuous transportation from El Paso, Texas, through New Mexico and Arizona to San Bernardino, California, and in support thereof introduced evidence of a contract with the Santa Fé to move Campbell's United Shows from Phoenix to Prescott, Clarkdale, Kingman, and thence into California.

It is evident that when Campbell's United Shows started from El Paso, Texas, on the peregrinations of a traveling show, it had mapped out a route traversing several states, and one familiar with the wanderings of such institutions would not undertake to place limitations upon its rovings by fixing its ultimate destination or many digressions from original plans. Its movements may be likened to that of a sightseer in going from one state into another on a common carrier, and, like the common carrier, both are subject to the rules, regulations, and laws applicable to interstate commerce. Each is entitled to and must pay the tariff rates as promulgated or approved by the Interstate Commerce Commission, but where the movement is wholly intrastate, and to be consummated under a separate and independent contract of transportation, even though it be an advance step along the general route outlined at the beginning of the trip, we think it is the subject of state control and regulation. Having arrived in a state the show or traveler in "doing" the state could not claim or demand the schedule rate for interstate transportation, but must pay at the local or intrastate rate as long as the movement is from one stop in the state to another stop in the state.

We think the decision reached by the supreme court of the United States in *Gulf, Colorado & Santa Fe Railway Company* v. *Texas*, 204 U. S. 403, 51 L. Ed. 540, 27 Sup. Ct. Rep. 360, is decisive of this case. The salient facts in the above case were: Two carloads of corn were shipped from Hudson, South Dakota, with ultimate destination Goldthwaite, Texas; the first lap of the movement was from Hudson to Texarkana, Texas; at this place a change of ownership was effected and a bill of lading issued to the new owner, calling for the transportation of the two identical cars and contents from Texarkana, Texas, over the lines of the Texas & Pacific Railway Company and the Gulf, Colorado & Santa Fé Railway Company to Goldthwaite, to be delivered there to Saylor & Burnett, the last consignees

and for whom the two carloads of grain were intended when first started on their journey from Hudson, South Dakota. The Gulf, Colorado & Santa Fé Railway Company refused to accept the charges from Texarkana to Goldthwaite as prescribed by the State Railroad Commission, and demanded and collected a larger sum, based upon the interstate rate. The state of Texas, in a statutory action for extortion, recovered judgment in the Texas courts; the railroad company appealed to the supreme court of the United States, contending that the movement from Texarkana, Texas, to Goldthwaite, Texas, was but an integral part of the movement from Hudson, South Dakota, to Goldthwaite, Texas, and interstate in character. The supreme court, speaking through Justice BREWER, said:

"The single question in the case is whether, as between Texarkana and Goldthwaite, this was an interstate shipment."

Further on he said:

"It is undoubtedly true that the character of a shipment, whether local or interstate, is not changed by a transfer of title during the transportation. But whether it be one or the other may depend on the contract of shipment. The rights and obligations of carriers and shippers are reciprocal. The first contract of shipment in this case was from Hudson to Texarkana. . . . The control over goods in process of transportation, which may be repeatedly changed by sales, is one thing; the transportation is another thing and follows the contract of shipment, until that is changed by the agreement of owner and carrier."

And the court further said that the "thought or purpose" of the shipper of the corn as to its further disposition "was a matter immaterial so far as the completed transportation was concerned," and illustrated his meaning in the following language:

"In this respect there is no difference between an interstate passenger and an interstate transportation. If Hardin, for instance, had purchased at Hudson a ticket for interstate carriage to Texarkana, intending all the while after he reached Texarkana to go on to Goldthwaite, he would not be entitled on his arrival at Texarkana to a new ticket from Texarkana to Goldthwaite at the proportionate fraction of the rate prescribed by the Interstate Commerce Commission

for carriage from Hudson to Goldthwaite. The one contract of the railroad companies having been finished he must make a new contract for his carriage to Goldthwaite, and that would be subject to the law of the state within which that carriage was to be made.''

*Gulf, Colorado & Santa Fe Railway Company* v. *Texas* has been followed and approved by the following: *Chicago, Milwaukee & St. Paul Railway Company* v. *State*, 233 U. S. 334, 58 L. Ed. 988, 34 Sup. Ct. Rep. 592; S. C., 152 Iowa, 317, 130 N. W. 802; *Pennsylvania R. R. Co.* v. *Mitchell*, 238 U. S. 251, 59 L. Ed. 1293, 35 Sup. Ct. Rep. 787; *United States* v. *Philadelphia & R. Ry. Co.* (D. C.), 232 Fed. 946; *Acme Cement Plaster Co.* v. *Chicago & Alton R. R. Co.*, 17 I. C. C. Rep. 220. In *Chicago, Milwaukee & St. Paul Railway Company* v. *Iowa, supra,* it is said:

''But the fact that commodities received on interstate shipments are reshipped by the consignees, in the cars in which they are received, to other points of destination, does not necessarily establish a continuity of movement or prevent the reshipment to a point within the same state from having an independent and intrastate character. *Gulf etc. Ry. Co.* v. *Texas*, 204 U. S. 403 [51 L. Ed. 540, 27 Sup. Ct. Rep. 360]; *Ohio Railroad Commission* v. *Worthington*, 225 U. S. 101, 109 [56 L. Ed. 1004, 32 Sup. Ct. Rep. 653]; *Texas & N. O. R. R. Co.* v. *Sabine Tram Co.*, 227 U. S. 111, 129, 130 [57 L. Ed. 442, 33 Sup. Ct. Rep. 229]. The question is with respect to the nature of the actual movement in the particular case.''

In Campbell's United Shows, including entertainers, attendants, and employees, there were about 110 ''passengers'' not distinguished in the application of the law from ordinary passengers when seeking transportation from a common carrier. The rest of the show consisted of baggage, animals, and some railroad equipment, the movements of which were necessarily coincident with the movement of the troop of entertainers, attendants, and employees.

The three principal cases relied upon by the appellant to sustain his contention that the carriage of the Campbell's Shows from Tucson to Phoenix was an integral part of a continuous movement from El Paso, Texas, through New Mexico and Arizona to California, and therefore interstate in character, are *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission*, 219 U. S. 498, 55 L. Ed. 310, 31 Sup. Ct.

Rep. 279; *Ohio Railroad Commission* v. *Worthington,* 225
U. S. 101, 56 L. Ed. 1004, 32 Sup. Ct. Rep. 653; *Texas & New
Orleans R. R. Co.* v. *Sabine Tram Co.,* 227 U. S. 111, 57 L. Ed.
442, 33 Sup. Ct. Rep. 229. These cases all pertained to
foreign commerce originating in the interior of the United
States, and at the time the shipments were started on their
journey they were definitely destined to some foreign port.
The very nature and character of the movements required
different carriers and changes of billing at the point of ex-
portation and some times before reaching the point of ex-
portation; hence it is said in those cases that the mere
"accident" of bills of lading and forms of contract of trans-
portation does not change the movement from an interstate or
foreign to an intrastate movement. Commenting upon those
cases in *Louisiana Railroad Commission* v. *Texas & Pacific
Ry. Co.,* 229 U. S. 336, reading at page 341, 57 L. Ed. 1215,
33 Sup. Ct. Rep. 837, at page 839, the court said:

"In those cases there was necessarily a local movement of
freight, and it necessarily terminated at the seaboard. But
it was decided that its character and continuity as a move-
ment in foreign commerce did not terminate, nor was it
affected by being transported on local bills of lading. The
principle enunciated in the cases was that it is the essential
character of the commerce, not the accident of local or
through bills of lading, which determines federal or state con-
trol over it. And it takes character as interstate or foreign
commerce when it is actually started in the course of trans-
portation to another state or to a foreign country." *Penn-
sylvania R. R. Co.* v. *Clark Coal Co.,* 238 U. S. 456, 59 L. Ed.
1406, 35 Sup. Ct. Rep. 896.

The articles involved in those cases, to wit, cotton-seed cake
and cotton-seed meal, coal and lumber, were all articles of
merchandise, the subject of barter and sale. The stoppage
of them occasioned by the necessities of transportation dur-
ing the course of their movement from the initial to the ter-
minal points of shipment on a continuous movement to an-
other state or foreign country may truthfully be said to be
mere "accidents" of the movement. It is not so with a circus
or carnival show where the stops are not "incidents" or
"accidents" of the movement, but are the only means by
which the purposes of a circus or show may be accomplished;

the movement of a circus and show being a mere accident to the object of its existence—the giving of exhibitions.

It is next contended that the Corporation Commission was without jurisdiction to make its order requiring appellant to transport Campbell's United Shows from Tucson to Phoenix, because no intrastate tariffs had been filed with the commission showing the rates for movement of privately owned equipment in circus trains or otherwise, or obliging appellant to transport privately owned equipment in circus trains. That the appellant was under no common-law obligation to accept the privately owned equipment of Campbell's United Shows we think is well settled. It could entirely refuse to accept such transportation, or if it should accept it the law permitted the common carrier to dictate the terms upon which the privately owned equipment of such a concern was transported. *Clough* v *Grand Trunk Western Ry. Co.*, 155 Fed. 81, 11 L. R. A. (N. S.) 446, 85 C. C. A. 1, and cases there cited.

The rule of the common law prevails in this jurisdiction, unless it has been changed and modified by statute. Looking to our statutes and to our Constitution, we are satisfied that the common-law rule has been abrogated in this state so as to make it obligatory upon common carriers to accept and transport the privately owned equipment of circuses and other show outfits under the rules, regulations, and rates, when reasonable and just, prescribed by the Corporation Commission. Article 15, section 2, of our Constitution provides that:

"All corporations other than municipal engaged in carrying persons or property for hire . . . shall be deemed public service corporations."

Section 3 provides that:

"The Corporation Commission shall have full power to, and shall, prescribe just and reasonable classifications to be used, and just and reasonable rates and charges to be made and collected, by public service corporations within the state for service rendered therein, and make reasonable rules, regulations, and orders, by which such corporations shall be governed in the transaction of business within the state, and may prescribe the forms of contracts and the systems of keeping accounts to be used by such corporations in transacting such business."

Chapter 11, title 9, Civil Code of 1913, known as the "Public Service Corporation Act," provides for the organization, powers, and jurisdiction of the Corporation Commission. In section 2278 thereof, subdivisions E and F, the term "transportation of persons" is defined to include every service in connection with or incidental to the safety, comfort, or convenience of the person transported, and the receipt, carriage, and delivery of such person and his baggage; and the term "transportation of property" is defined to include every service in connection with or incidental to the transportation of the property. In subdivision Z, the term "public service corporation" is defined to include every common carrier, and further declares it to be subject to the jurisdiction, control, and regulation of the commission under the provisions of this chapter. Section 2289 provides that: "All charges made, demanded or received by any public service corporation . . . for . . . any service rendered or to be rendered, shall be just and reasonable," and prohibits unjust or unreasonable charges or demands for any service. Section 2290 requires every common carrier to file with the commission schedules showing the rates, fares, charges, and classifications for transportation between termini, within this state, of persons and property from each point upon its route to all other points thereon. It also requires every public service corporation, other than a common carrier, to file with the commission, under such rules and regulations as may be prescribed, like schedules. Section 2295 reads as follows:

"No public service corporation shall, as to rates, charges, service, facilities, or in any other respect, make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage. No public service corporation shall establish or maintain any unreasonable difference as to rates, charges, service, facilities or in any other respect, either as between localities or as between classes of service. The commission shall have the power to determine any question of fact arising under this section."

Section 2307 vests the Corporation Commission with power and jurisdiction to supervise and regulate every public service corporation in the state, and to do all things convenient and necessary in the exercise of such power and jurisdiction. Section 2308 empowers the commission, after a hearing, if it

shall find any contract affecting rates, fares, charges, or classification to be unjust, unreasonable, discriminatory, or preferential, to determine the just, reasonable, or sufficient rates, fares, charges, and classifications for contracts to be thereafter observed; and further authorizes this action of the commission upon a single rate, fare, charge, or contract.

We think it was the intention of the law, both constitutional and statutory, that the Corporation Commission should have plenary power over every public service corporation transacting business in this state of a local nature. That this power of supervision extends to contracts for the transportation of both persons and property, whether effected in the capacity of private carrier or common or public carrier. Nor do we think that appellant can complain because it had neglected to file with the commission tariffs showing the rates for the movement of privately owned equipment of circuses and like organizations. These omissions may be excused, as stated by the Interstate Commerce Commission in its rules concerning circuses and other show outfits, owing to "the peculiar nature of this traffic and the difficulties of establishing rates thereon in advance of shipper's request describing the character and volume of the traffic offered," but it cannot justify a refusal upon application to fix just and reasonable rates or to enter into just and reasonable contracts.

For the first time the appellant raises the question in this court that the statute (section 2357) under which the Corporation Commission assessed the fine in question is unconstitutional and void. The attorney for the appellant in the trial court during the course of the trial entered into the following oral stipulation:

"I am going further . . . and stipulate that if the Arizona Corporation Commission had power and authority and proceeded regularly as required by the statutes of the state of Arizona to enter the original order compelling us to promulgate and apply this original rate that they ordered, that then they have taken sufficient proceedings to adjudge us in contempt. That narrows the issues to determine whether or not the commission in first instant entered a valid order, their original order."

Notwithstanding this stipulation, it is now urged that the law is unconstitutional because of the excessive fines and penalties provided, and we are referred to the cases of *Bon-*

*bright* v. *Geary* (D. C.), 210 Fed. 44, and *Van Dyke* v. *Geary* (D. C.), 218 Fed. 111, as authority for this contention. The question involved in those cases is not the one involved here. Those cases involved the danger of the public utility incurring a liability for every day the order of the commission was not observed or obeyed pending an appeal to determine the validity of the order issued by the commission—the statute (section 2352) making every violation of any order, etc., a separate and distinct offense, and in case of a continuing violation each day's continuance thereof a separate and distinct offense.

We think it is clear from a reading of those decisions that it was not so much the severity of the penalty as the daily cumulation of penalties while testing the legality of the commission's action that influenced the decisions against the validity of the law. In the Van Dyke case, SAWTELLE, District Judge, quoted from *Ex parte Young*, 209 U. S. 123–144, 14 Ann. Cas. 764, 13 L. R. A. (N. S.) 932, 52 L. Ed. 714, 28 Sup. Ct. Rep. 441, 447, the contention of the complainants as follows:

"The contention is urged by the complainants in the suit that the company is denied the equal protection of the laws, and its property is liable to be taken without due process of law, because it is only allowed a hearing upon the claim of the unconstitutionality of the acts and orders in question,. at the risk, if mistaken, of being subjected to such enormous penalties, resulting in the possible confiscation of its whole property, that rather than take such risks the company would obey the laws, although such obedience might also result in the end (though by a slower process) in such confiscation. . . . Coming to the inquiry regarding the alleged invalidity of these acts, we take up the contention that they are invalid on their face on account of the penalties."

Further quoting from the Young case:

"We hold, therefore, that the provisions of the acts, relating to the enforcement of the rates, either for freight or passengers, by imposing such enormous fines and possible imprisonment as a result of an unsuccessful effort to test the validity of the laws themselves, are unconstitutional on their face, without regard to the question of the insufficiency of those rates."

·· The decision in the Van Dyke case was limited in this language:

"On the authority of these cases and on principle we are of the opinion, and so decide, that said Act 90 of the First Legislature of the state of Arizona imposes such penalties and imprisonment as to practically deprive the complainant of the right to appeal to the court to determine the validity of the law and the orders of the Corporation Commission, and is therefore unconstitutional in that particular."

The order here applies to a single rate for one trip only. It was not a permanent order, and could not be violated but once; no daily accumulation of penalties or fines could result from its disobedience; the appellant took no chances of incurring accumulated fines and penalties in prosecuting this appeal, and, not being affected by the feature of the law held unconstitutional in the Van Dyke and Bonbright cases, is not in a position to raise the question.

The judgment of the lower court is affirmed.

FRANKLIN, C. J., concurs.

CUNNINGHAM, J. (Dissenting).—The essential question in this case is whether the movement of the Campbell's United Shows from Tucson to Phoenix *via* Maricopa, a movement wholly within the state of Arizona, is a movement of interstate commerce and under the protection of section 8, article 1, of the United States Constitution. If, in fact, such movement was interstate commerce, the Arizona Corporation Commission, by its order made and entered on March 25, 1914, exceeded its jurisdiction by fixing a transportation rate chargeable for the movement, and the order so made was void and incapable of initiating a duty on the railroad company.

The trial court made special findings of fact and stated its conclusions of law therefrom. The court in its findings of fact does not find any fact nor refer to any testimony which shows or tends to show the points from and to which the shows moved on the journey. The findings are limited to the movement from Tucson to Phoenix within the state of Arizona. The conclusions of law on this issue are equally unsatisfactory. In the third paragraph of the conclusions of law the court finds as a fact, not as a matter of law, that the order of the Corporation Commission made and entered on March

25, 1914, "in no way imposed a burden upon interstate commerce." Inferentially the trial court must have believed that the movement of the said shows between the points in question was not in fact a movement of interstate commerce; but the fact was not found by the court.

A careful examination of the opinion of the Arizona Corporation Commission annexed to the complaint in this case, the basis for the order of March 25, 1914, will disclose that the Corporation Commission did not consider the matter of the beginning and termination of the journey laid out by the Campbell's United Shows, but only took into its consideration the matter of the reasonableness of rates charged by railroad companies for transportation between points in Arizona. The issue of fact whether the movement was interstate commerce is squarely presented in this case, and is the controlling issue joined and incapable of determination in the absence of evidence of the entire journey.

The defense introduced substantial evidence tending to show that it moved the Campbell's United Shows from Tucson to Phoenix under a rate prescribed by the federal Interstate Commerce Commission; that said shows were moved from Phoenix to a point within the state of California stopping at a number of points along the course of the journey, but the movement was made pursuant to special rate contracts. The defendant introduced evidence tending to show that about March 6, 1914, the Campbell's United Shows opened negotiations with defendant, Southern Pacific Company, for transportation "between Tucson and Phoenix, with a probable movement to other points in Arizona and in California, at that time explaining that they were coming from Deming, New Mexico, into Tucson over the El Paso & Southwestern."

The reporter's notes of the hearing before the Corporation Commission resulting in the order of March 25, 1914, and introduced as a portion of Plaintiff's Exhibit "B" in this cause, disclose that the representative of Campbell's United Shows, Mr. E. L. Williams, being examined before the commission, was asked:

"Where do you propose to go from here?

"Mr. Williams: From here to Prescott, Clarkdale, and Kingman, and from Kingman to Needles, and then into California."

The evidence is therefore without conflict that the starting place of this organization of shows was Deming, in the state of New Mexico, and its stopping place was within the state of California, the exact point in contemplation is left in doubt by the evidence, but that the route for the journey determined upon in advance of starting from Deming, New Mexico, was through Arizona to Needles in the state of California, with the expectation of frequent stops incidentally along the course of the proposed journey, is clearly shown. The transportation companies were informed of the proposed route of travel from the place of beginning to its termination at Needles, California, at least. The proposed incidental stopping places were not disclosed, nor, perhaps, fully determined upon. That the shows would stop at Tucson and at Phoenix, however, was definitely determined, of which stops the transportation companies involved had information. These facts were shown before the Corporation Commission before its order was made on March 25, 1914, and upon the trial of this cause the facts are undisputed. Notwithstanding these very vital and controlling facts before the court, directly bearing on and *prima facie* establishing the defendant's alleged defense, no special finding or any finding with regard thereto was made by the court.

Passengers, baggage, and freight move in interstate commerce, and are therefore subject to the exclusive regulation of the laws of Congress under section 8 of article 1 of the United States Constitution when the movement is commenced in one of the states with the intention that such movement shall continue and ultimately terminate within another state, and that intention is consummated. It is not the contract for the rate of transportation which controls the character of the movement. The incidental interruption of the movement along its course, either voluntarily or involuntarily, is not the controlling factor. It is the commencement and ending of the continuous journey in contemplation with which the movement begins which fixes the character of interstate commerce upon the thing moved. The several contracts of transportation of the interstate commerce pursuant to which the movement is commenced and continued to its terminus does not fix the character of the thing moved. The fact that the movement is not intended to proceed without incidental stop-overs, or under one contract, or that any of the trans-

portation companies handling the movement acts for itself and not in conjunction with the other connecting companies in the movement of the thing, does not impair the interstate commerce character of the thing moved, nor the movement participated in by the several transporting companies. Hence the evidence establishes the fact that the movement of the Campbell's United Shows from Tucson to Phoenix was a movement along a connecting link of the journey contemplated and commenced at Deming, in the state of New Mexico, and intended to terminate within the state of California, in the course of which journey the intention of the shipper was to pass over the Southern Pacific Company's road from Tucson to Phoenix in the state of Arizona, as a definite portion and continuation of such journey, of which intention the Southern Pacific Company had full notice.

As a conclusion of law from these facts, the said shows, when they commenced the journey, and continuing on the journey from Tucson to Phoenix, were in character moved in interstate commerce. The attempt of the Arizona Corporation Commission to prescribe rates chargeable for such movement of such interstate commerce is an interference with a matter with which the said Corporation Commission has no jurisdiction, and as a consequence the order violated by the Southern Pacific Company was void, and its violation did not subject the Southern Pacific Company to punishment.

When goods have been delivered to a carrier for transportation to a destination in another state, and when they have actually started in the course of transportation to another state, such goods are in interstate commerce. *Southern Pac. Terminal Co.* v. *Interstate Commerce Commission and Young,* 219 U. S. 498, 55 L. Ed. 310, 31 Sup. Ct. Rep. 279; *Texas & N. O. R. R. Co.* v. *Sabine Tram Co.,* 227 U. S. 111, 57 L. Ed. 442, 33 Sup. Ct. Rep. 229; *Railroad Commission* v. *Worthington,* 225 U. S. 101, 56 L. Ed. 1004, 32 Sup. Ct. Rep. 653; *United States* v. *Union Stockyard,* 226 U. S. 286, 57 L. Ed. 226, 33 Sup. Ct. Rep. 83; *Gulf, C. & S. F. R. Co.* v. *Texas,* 204 U. S. 403, 51 L. Ed. 540, 27 Sup Ct. Rep. 360; *Easdale* v. *A., T. & S. F. Ry. Co.,* 100 Kan. 305, 164 Pac. 164—citing *Louisiana R. R. Com.* v. *T. & P. Ry.,* 229 U. S. 336, 57 L. Ed. 1215, 33 Sup. Ct. Rep. 837, and *A., T. & S. F. Ry. Co.* v. *Harold,* 241 U. S. 371, 60 L. Ed. 1050, 36 Sup. Ct. Rep. 665. Hence if the movement from Deming, New Mexico,

to Tucson, Arizona, is considered as a completed transaction, certainly the movement from Tucson was commenced to terminate ultimately in the state of California, and the movement on the journey commenced, the object moved became impressed with the character of interstate commerce and the regulation of such movement as to rates of transportation remained exclusively with the Interstate Commerce Commission, because that authority had acted in the matter and prescribed the rate chargeable for the transportation of such class of commerce.

The judgment in this case is not sustained by the evidence nor by the law. I am of the opinion that the judgment should be vacated and the cause dismissed for the reason the Arizona Corporation Commission did not have power to make and enter the order of March 25, 1914, and therefore such order was a nullity, and the appellant's failure to obey the order created no liability to punishment.